**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**

       **Case No. 15-40091-01-DDC**

**DENISE CHRISTY (01),**

       **Defendant.**

## MEMORANDUM AND ORDER

On January 12, 2017, a jury convicted defendant Denise Christy of 19 counts: (1) one count of bank embezzlement in violation of 18 U.S.C. § 656; (2) six counts of falsification of bank records in violation of 18 U.S.C. § 1005; (3) six counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1); and (4) six counts of conducting or attempting to conduct a financial transaction involving the proceeds of specified unlawful activity with the intent to engage in conduct violating section 7201 or 7206 of the Internal Revenue Code of 1986— conduct that constitutes a violation of 18 U.S.C. § 1956.

Ms. Christy has filed a Motion for Judgment of Acquittal (Doc. 59) and Motion for New Trial (Doc. 60). The government has responded to both motions (Doc. 61). After carefully considering the facts and arguments presented by the parties, the court denies both motions. In short, the government presented evidence sufficient for a rational jury to find Ms. Christy guilty beyond a reasonable doubt of the 19 counts of conviction. Ms. Christy also has failed to show that the ends of justice require a new trial.

## I.      Factual and Procedural Background

The government presented the following evidence, among other things, at trial.  Ms. Christy was employed by Central National Bank ("CNB") at its branch located in Burlington, Kansas.  She reported to the branch manager, Elaine Gifford.  In 2013, Steve Snook, a Director of CNB, expressed concern to Ms. Gifford about the amount of money in the Burlington branch's vault.  The branch's records showed it was carrying amounts up to $1,000,000.  Mr. Snook believed that amount was greater than necessary, posing a security risk and a lost opportunity for the bank to earn interest on the money it invested in some other account.  Mr. Snook thus directed Ms. Gifford to reduce the amount of cash in the vault to $500,000 in the coming weeks.  In turn, Ms. Gifford asked Ms. Christy to start selling cash to the Federal Reserve Bank to reduce the amount of money in the branch's vault.

A few months later, Lisa Nabus, a CNB employee tasked with reviewing the bank's sales of cash to the Federal Reserve Bank, began to notice discrepancies in cash out tickets prepared by Ms. Christy.  The cash out tickets represented that the Burlington branch had made sales of cash to the Federal Reserve Bank, but the amounts reported by Ms. Christy either never arrived at the Federal Reserve Bank, or they arrived in smaller amounts than those reported on the cash out tickets.  Ms. Nabus communicated with Ms. Christy about these discrepancies on many occasions.

On December 17, 2013, Ms. Christy prepared a cash out ticket representing that the branch had sold $401,000 to the Federal Reserve Bank.  Nine days later, Ms. Christy contacted Ms. Nabus to report that she had incorrectly reported the amount.  Instead, Ms. Christy had sold just $104,000 to the Federal Reserve Bank.  Ms. Nabus instructed Ms. Christy to run an adjustment at the branch to correct the error.

On January 14, 2014, Ms. Christy prepared a cash out ticket representing that the branch had sold $400,000 to the Federal Reserve Bank. After Ms. Nabus realized that the Federal Reserve Bank never credited CNB for the $400,000, she contacted Ms. Christy asking if she was aware of any issues with the shipment. Ms. Christy apologized and explained that she never should have run the cash out ticket because the branch never sold the money. Ms. Christy offered to run the appropriate correction, but did not do so immediately. After several inquiries from Ms. Nabus, Ms. Christy finally made the appropriate correction on February 21, 2014.

On February 25, 2014, Ms. Christy prepared a cash out ticket representing that the branch had sold $562,000 to the Federal Reserve Bank. Ms. Nabus determined that the Federal Reserve Bank never credited CNB for the $562,000. So, she contacted Ms. Christy about the discrepancy. Ms. Christy acknowledged that the branch never sent the money to the Federal Reserve Bank. Ms. Christy eventually corrected the error on March 18.

On March 18, 2014, Ms. Christy prepared three separate cash out tickets representing that the branch had sold $270,000, $225,000, and $225,000, to the Federal Reserve Bank. Ms. Nabus determined that the Federal Reserve Bank never credited CNB for the amounts reported on each of the three cash out tickets. So, again, Ms. Nabus contacted Ms. Christy about these discrepancies. Ms. Christy said she would look into the matter, and later responded that the amounts reported were an error. She offered to correct them.

On April 22, 2014, Ms. Christy prepared a cash out ticket representing that the branch had sold $401,000 to the Federal Reserve Bank. After Ms. Nabus determined that the Federal Reserve Bank has credited CNB for just $101,000, she contacted Ms. Christy. Ms. Christy conceded that the $401,000 reported on the cash out ticket was an error, and, again, she said she was in the process of fixing it.

While working with Ms. Christy to resolve these issues, Ms. Nabus began to grow concerned about the repeated errors she was finding. She thought something didn't feel right. So, Ms. Nabus reported her concerns to Vicky Farres, an auditor employed by CNB. In response to Ms. Nabus' report, Ms. Farres conducted a surprise audit of the vault at the Burlington branch on May 21, 2014. According to the bank's accounting report, the vault should have contained $883,320 in cash on the day of the surprise audit. The report is generated by a software system that the bank uses to track vault transactions and sales of cash to the Federal Reserve Bank. The amount reported by the system is based on information that Ms. Gifford and Raylene Thorne (another CNB employee at the Burlington branch and Ms. Christy's sister-in-law) input into the system electronically. Ms. Gifford and Ms. Thorne both testified at trial that the information they put into the electronic system was based on calculator tapes that Ms. Christy gave to them.

The May 21 surprise audit revealed that the vault was $770,000 short of the amount reflected in the bank's accounting records. Ms. Farres testified at trial about that audit. She described Ms. Christy as nervous, but Ms. Farres also recognizes that nervousness is a typical response for employees when an auditor arrives at the bank. Ms. Farres described other behavior of Ms. Christy that she thought was strange. For example, Ms. Christy delayed the start of the audit. Ms. Farres had to ask her more than once to get started on the count. Then, after Ms. Christy started counting the money, Ms. Farres saw that she was attempting to return unstrapped money to the vault after Ms. Farres had counted it. By doing this, Ms. Farres could not tell whether Ms. Christy was taking money from the vault that they already had counted and thus disrupting the count. Ms. Christy also claimed that $100,000 (in $100 dollar bills) had fallen down a small crack between the cash vault and the wall. Ms. Farres retrieved a flashlight and looked down the crack. She found nothing there.

When Ms. Farres had completed the audit and determined that the vault was missing $770,000, she asked Ms. Christy where the missing money was located. Ms. Christy said that she thought she had sold it to the Federal Reserve Bank on May 20, 2014. So, Ms. Farres then asked Ms. Christy to produce the receipt from Garda (the private security firm that CNB hires to transport currency to the Federal Reserve Bank) showing that Garda had picked up the $770,000 for transport the previous day. Ms. Christy said Garda never provided her with a receipt.

But, the following day, Ms. Christy emailed three Garda receipts to Ms. Gifford. The three receipts reflected three separate deposits that the branch purportedly had entrusted to Garda—one in the amount of $90,000, a second in the amount of $100,000, and a third in the amount of $670,000. Although Ms. Christy had said the day before that Garda never gave her receipts, she explained in the email to Ms. Gifford that she hadn't even thought about having the Garda receipts during the audit. She said that she had found the receipts when she was going through a drawer.

The government asserted at trial that Ms. Christy had fabricated two of the three receipts. The government contends that the $90,000 receipt is a bona fide receipt for cash that the branch actually entrusted to Garda on May 20, 2014, to transport to the Federal Reserve Bank.[1] But the government asserts that Ms. Christy fabricated the $100,000 and $670,000 receipts to conceal the $770,000 that was missing from the vault. The government supported this assertion with the following evidence.

First, the government presented the original bona fide cash out ticket showing that the branch had sold $90,000 to the Federal Reserve on May 20, 2014. This original ticket bears a "proof strip" showing the date when the money was sold to the Federal Reserve Bank. A proof

---

[1] The Federal Reserve Bank confirmed that it received the $90,000 shipment and credited CNB for this sale only.

machine applies the proof strip, and no one can change the information on it. The original bona fide cash out ticket showing the $90,000 sale bears a proof strip showing the sale date as May 20, 2014. The government also presented the cash out ticket for the purported sale of $770,000 to the Federal Reserve Bank. Ms. Christy prepared the ticket—it bears her initials. The ticket also bears a proof strip showing the date of the sale as May 21, 2014—the day after the $90,000 sale and the same day as the surprise audit.

Second, the bank never located the originals of the two Garda receipts showing the $100,000 and $670,000 amounts. However, the bank did find the original Garda receipt showing the $90,000 that Garda picked up on May 20, 2014. Another bank employee testified that she found the $90,000 receipt under the mouse pad on Ms. Christy's desk after the bank had placed Ms. Christy on leave.

Third, the government produced a transparency of the bona fide $90,000 Garda receipt. The bottom of the $90,000 receipt bears the signatures of Ms. Christy and Adam Lewis, the Garda employee who picked up the cash on May 20, 2014. The government placed the transparency over the $100,000 and $670,000 receipts, and the signatures match exactly. The government asserted that it is impossible, without falsification, to have two signatures on three documents match perfectly.

Fourth, the original $90,000 Garda receipt bears the bag number of the delivery—02755778. A CNB employee testified that the bank uses sequentially ordered bags. The bag numbers on the $100,000 and $670,000 Garda receipts are indecipherable. The government asserted that Ms. Christy had obliterated the numbers to conceal her fabrication. When one places the transparency over the $100,000 and $670,000 receipts, the receipts bear the same

obliterations on their respective bag numbers.  Also, the Garda employee, Adam Lewis, testified that he never would have presented the bank with receipts containing obliterated bag numbers.

Finally, the government presented surveillance photographs of Mr. Lewis leaving the bank on May 20, 2014.  In the photos, Mr. Lewis is pushing a two-wheeled hand truck with a single bank bag hanging on the handles.  Mr. Lewis confirmed that the photos showed him picking up the $90,000 that he transported on May 20, 2014.  Another bank employee testified that she examined the surveillance videos, and she saw Mr. Lewis come inside and leave the bank just this one time with this one load.  For demonstrative purposes, the government presented a photograph of a two-wheeled hand truck containing $860,000 in the same denominations that Ms. Christy claimed she had delivered to Garda on May 20, 2014.  The government asked the jury to compare the noticeable differences between the two-wheeled hand truck containing $90,000—as shown in the surveillance photos—and the one containing $860,000 that the government presented for demonstrative purposes.

The government also presented evidence at trial of unexplained cash deposits that Ms. Christy made into her own bank accounts between 2008 and 2013.  The government submitted Ms. Christy's tax returns for 2009 through 2014.  The tax returns identified Ms. Christy and her husband's W-2 earnings as a source of income.  Ms. Christy also earned a modest income from Mary Kay sales.  And, Mr. and Ms. Christy reported some income from their farm, but for the years 2008 through 2013, they reported the farming operation as a loss.  None of these reported income streams could account for the more than $400,000 in cash deposits from undisclosed sources that Ms. Christy made into her personal bank accounts during that time.

At the trial's conclusion, the jury deliberated and returned guilty verdicts for 19 of the 23 counts the government had charged in the Indictment.  The jury acquitted Ms. Christy of four

counts charging her with money laundering. But the jury convicted Ms. Christy of one count of bank embezzlement, six counts of falsification of bank records, six counts of filing false income tax returns, and six counts of money laundering. Ms. Christy now asks the court to enter a judgment of acquittal, or alternatively, grant a new trial.

## II.     Motion for Judgment of Acquittal

### A.     Legal Standard

On a motion for judgment of acquittal under Fed. R. Crim. P. 29(c), the court must uphold the jury's verdict of guilty if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001) (citation and internal quotation marks omitted). Put another way, the court will reverse a jury's verdict only if no reasonable juror could have found the defendant guilty. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015); *United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001).

When reviewing a defendant's sufficiency of the evidence claim, the court "must ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [defendant] guilty beyond a reasonable doubt." *Magleby*, 241 F.3d at 1311–12 (citation and internal quotation marks omitted). "[T]he evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *Id.* at 1112 (citation and internal quotation marks omitted). And "where conflicting evidence exists" the court must "not question the jury's conclusions regarding the credibility of witnesses or the relative weight of evidence." *Id.* Instead, the court simply must "determine whether [the] evidence, if believed, would establish each element of the crime."

*United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (quoting *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994)).  The court thus must give "considerable deference to the jury's verdict."  *Dewberry*, 790 F.3d at 1028 (citation and internal quotation marks omitted).  But, while the court's review is deferential, the evidence must do "more than raise a mere suspicion of guilt."  *Id.* (internal quotation marks and citation omitted).  And, any inferences drawn from direct and circumstantial evidence "must be more than speculation and conjecture to be reasonable."  *Id.* (citation and internal quotation marks omitted).

### B.  Analysis

Ms. Christy moves the court to "set aside the verdict and enter an acquittal" under Fed. R. Civ. P. 29(c)(2).  She alleges insufficient evidence existed to support the jury's guilty verdicts on Counts 1, 2–7, 8–13, and 18-23.  The court addresses each of the counts, separately, below.

### 1.  Count 1:  Bank Embezzlement

Ms. Christy asserts that, viewing all the evidence admitted at trial in the light most favorable to the government, no reasonable jury could find her guilty, beyond a reasonable doubt, of the bank embezzlement charge in Count 1 of the Indictment.  To secure a conviction for bank embezzlement, the government must prove:  (1) the defendant was a bank employee; (2) the bank was a federally insured institution; (3) the defendant knowingly embezzled funds entrusted to the care of the bank; (4) the defendant acted with intent to injure or defraud the bank; and (5) the amount of money taken was more than $1,000.  *See* 10th Cir. Crim. Pattern Jury Instruction No. 2.32 (2011); *see also United States v. Flanders*, 491 F.3d 1197, 1208 (10th Cir. 2007).

The government opposes Ms. Christy's argument.  It asserts that sufficient evidence exists to support the jury's verdict that Ms. Christy knowingly embezzled about $700,000 of the

funds entrusted to CNB, as charged in Count 1 of the Indictment. The court agrees. A rational

juror could have found the five essential elements of bank embezzlement beyond a reasonable

doubt through the direct and circumstantial evidence presented at trial, and reasonable inferences

drawn from that evidence.

The evidence at trial established that Ms. Christy was employed by CNB, which is a

federally insured institution. As described above, a surprise audit at the bank's branch in

Burlington, Kansas revealed that $770,000 was missing from the bank's vault. Witnesses

testified that Ms. Christy had access to the money in the vault and regularly provided the

balances of that money for other employees to enter into the electronic accounting system. The

surprise audit was initiated after Lisa Nabus expressed concerns about Ms. Christy's repeated

errors in reporting cash sales to the Federal Reserve Bank and Ms. Christy's failure to correct

those errors promptly. Auditor Vicky Farres described Ms. Christy's strange behavior on the day

of the audit, including her claim that she had dropped $100,000 down a small crack between the

cash vault and the wall. Ms. Farres looked for the $100,000 using a flashlight but never found

any money. When Ms. Farres asked Ms. Christy about the missing $770,000, Ms. Christy

claimed that she had sold the money to the Federal Reserve Bank the previous day but that Garda

never gave her receipts of the sale.

Yet, the next day, Ms. Christy provided her supervisor three receipts from Garda. Two of

the receipts showed that Ms. Christy had delivered to Garda $770,000—the same amount that

was missing from the vault after the audit. The government presented several pieces of evidence

from which a rational jury could conclude that Ms. Christy had falsified and fabricated these two

Garda receipts. The government also presented sufficient evidence from which the jury could

find that Ms. Christy had falsified the $770,000 cash out ticket of the purported sale. And, the

government presented evidence that Ms. Christy had made more than $400,000 in cash deposits from undisclosed sources into her personal bank accounts.

Viewed in the light most favorable to the government, the evidence presented at trial was sufficient for a rational jury to find Ms. Christy guilty, beyond a reasonable doubt, of the five elements of bank embezzlement as charged in Count 1 of the Indictment. The court thus denies Ms. Christy's motion to set aside the jury's verdict on Count 1.

## 2. Counts 2–7: Falsification of Bank Records

Ms. Christy next asserts that the evidence was insufficient to support the jury's guilty verdicts on Counts 2 through 7. These counts charged Ms. Christy with falsification of bank records in violation of 18 U.S.C. § 1005.

Section 1005 of Title 18 of the United States Code makes it a crime to make a false entry in any book, record, or statement of a federally insured bank, knowing the entry is false, and with intent to injure or defraud the bank or to deceive an officer of that bank. 18 U.S.C. § 1005. To secure a conviction under § 1005, the government must prove beyond a reasonable doubt that: (1) the bank was a federally insured bank; (2) the defendant made a false entry in a book, record, or statement of the bank; (3) the defendant knew the entry was false when she made it; and (4) the defendant made the false entry with the intent to deceive an officer of the bank. *See* 10th Cir. Crim. Pattern Jury Instruction No. 2.47 (2011); *see also United States v. Weidner*, 437 F.3d 1023, 1037 (10th Cir. 2006) ("[T]o establish a violation of § 1005, the government must establish beyond a reasonable doubt that: '(1) an entry made in bank records is false; (2) the defendant made the entry or caused it to be made; (3) the defendant knew the entry was false at the time he . . . made it; and (4) the defendant intended that the entry injure or defraud the bank or public officers.'" (quoting *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992))).

Ms. Christy's Motion for Acquittal never argues—specifically—the elements of this crime that the government purportedly failed to prove at trial. But, after reviewing the evidence, the court concludes that the government presented sufficient evidence from which a rational jury could find, beyond a reasonable doubt, that Ms. Christy falsified bank records as charged in Counts 2 through 7.

Count 2 charged Ms. Christy with making a false entry on December 17, 2013, representing she had sold $401,000 to the Federal Reserve Bank, but she had only sold $104,000 to the Federal Reserve Bank. Count 3 charged Ms. Christy with making a false entry on January 14, 2014, representing she had sold $400,000 to the Federal Reserve Bank, but she had sold no money to the Federal Reserve Bank. Count 4 charged Ms. Christy with making a false entry on February 25, 2014, representing she had sold $562,000 to the Federal Reserve Bank, but she had sold no money to the Federal Reserve Bank. Count 5 charged Ms. Christy with making a false entry on March 18, 2014, representing she had made three separate tickets of $270,000, $225,000, and $225,000, which she said would be sold to the Federal Reserve Bank, but she had sold no money to the Federal Reserve Bank. Count 6 charged Ms. Christy with making a false entry on April 22, 2014, representing that Ms. Christy had sold $401,000 to the Federal Reserve Bank, but she only had sold $101,000 to the Federal Reserve Bank. And, Count 7 charged Ms. Christy with making a false entry on May 21, 2014, representing she had delivered $770,000 to Garda for transport to the Federal Reserve Bank, but she only had delivered $90,000 for transport to the Federal Reserve Bank.

As described above in Part I, the government presented evidence showing that Ms. Christy prepared each of these entries on these dates and in these amounts, as charged in Counts 2 through 7. CNB employee Lisa Nabus testified about the discrepancies between the amounts

Ms. Christy had reported in her entries and the cash that the Federal Reserve Bank actually had received. The evidence established that Ms. Christy's entries were false because either the money Ms. Christy had reported never arrived at the Federal Reserve Bank or arrived in smaller amounts than Ms. Christy had reported.

The government also presented sufficient evidence from which a rational jury could conclude that Ms. Christy knew the entries were false when she made them and that she made them with the intent to deceive an officer of the bank. Viewing the evidence in the light most favorable to the government, the jury reasonably could infer from the circumstantial evidence presented at trial that Ms. Christy made these false entries as part of an effort to conceal her embezzlement of funds from the bank's vault. The court thus denies Ms. Christy's motion to set aside the jury's verdicts on Counts 2 through 7.

### 3. Counts 8–13: Filing False Tax Returns

Ms. Christy next argues that the evidence presented at trial was insufficient to support the jury's guilty verdicts on Count 8 through 13. These counts charged Ms. Christy with filing false income tax returns in violation of 26 U.S.C. § 7206(1), for the years 2009 through 2014. To secure a conviction under § 7206(1), the government must prove beyond a reasonable doubt that: (1) the defendant signed an income tax return that contained a written declaration that it was made under the penalties of perjury; (2) the return contained a false statement; (3) the defendant knew that statement was false; (4) the defendant acted willfully, that is, with the voluntary intent to violate a known legal duty; and (5) the statement was material. *See* 10th Cir. Crim. Pattern Jury Instruction No. 2.93 (2011); *see also United States v. Owen*, 15 F.3d 1528, 1532 (10th Cir. 1994) ("To sustain a conviction under section 7206(1), the government must prove (1) that the [defendant] made and subscribed to a tax return containing a written declaration, (2) that it was

made under the penalties of perjury, (3) that he did not believe the return to be true and correct as to every material matter and (4) that he acted willfully.").

Ms. Christy concedes that the government presented evidence at trial of unexplained cash deposits made into Ms. Christy's personal bank accounts. But, Ms. Christy asserts that the government failed to prove beyond a reasonable doubt that the source of these deposits was income that Ms. Christy did not report on her income tax returns. Ms. Christy contends that the only evidence presented to support the jury's verdict was a mere inference that the missing money from the bank's vault was the source of Ms. Christy's unexplained cash deposits. And, Ms. Christy asserts that no reasonable jury could conclude, beyond a reasonable doubt, based on this mere inference that she is guilty of filing false income tax returns. The court disagrees.

Although the government could not prove, definitively, the source of Ms. Christy's unexplained cash deposits, an IRS agent testified about the government's investigation into Ms. Christy's finances. The IRS reviewed Ms. Christy's tax and bank records. The IRS also interviewed Ms. Christy's personal accountant. Through this investigation, the IRS attempted to identify every source of income available to Ms. Christy and her husband. The IRS never could identify any source for Ms. Christy's unexplained cash deposits. This evidence, coupled with the evidence supporting the jury's verdict on the embezzlement charge, was sufficient for a rational jury to conclude that the unexplained cash deposits were funds that Ms. Christy had embezzled from the bank. Also, the evidence was sufficient for the jury to conclude that Ms. Christy had failed to report those unexplained cash deposits as income on the federal income tax returns that she filed from 2009 through 2014.

The government asserts that this evidence is similar to the facts presented in *United States v. Adams*, 314 F. App'x 633 (5th Cir. 2009). *Adams* affirmed the defendant's conviction

for filing a false income tax return. *Id.* at 646–49. At trial, the government had "employed an indirect method of proof" showing that the defendant's gross deposits in his bank accounts exceeded the income the defendant reported on his income tax return. *Id.* at 644–45. The Fifth Circuit held that the evidence was sufficient to support the jury's verdict because the government demonstrated that it adequately had investigated the defendant's finances and had determined with reasonable certainty that the defendant's gross deposits exceeded his reported income. *Id.* at 647.

The facts here also are similar to those in *United States v. Michals*, 469 F.2d 215 (10th Cir. 1972). There, a jury had convicted the defendant for filing false and fraudulent income tax returns. *Id.* at 216. The government asserted that the defendant had additional taxable income that he failed to report on his income tax returns. *Id.* at 217. The government had "not attempt[ed] to show precisely where the unreported income came from, but relied upon an indirect method of calculating income, involving an analysis of [defendant's] bank deposits and cash expenditures." *Id.* Through this method, the government presented evidence that the defendant made unexplained cash deposits into his bank accounts that exceeded the gross income that he had reported on his tax returns. *Id.* at 218. The Tenth Circuit held that this evidence was sufficient to support the jury's verdict, and it affirmed the defendant's convictions. *Id.*; *see also United Sates v. Mounkes*, 204 F.3d 1024, 1028 (10th Cir. 2000) (affirming the district court's denial of a motion for judgment of acquittal because the evidence was sufficient for a reasonable jury to find, beyond a reasonable doubt, that the defendants attempted to evade paying income taxes when the government had shown with "reasonable certainty" that defendants' bank deposits and cash expenditures exceeded their reported income and thus allowed a reasonable jury to infer that the defendants had unreported income).

Like the above cases, the government here presented sufficient evidence for a reasonable jury to infer that the source of Ms. Christy's unexplained cash deposits was income that she had failed to report on her income tax returns for the years 2009 through 2014 in violation of 26 U.S.C. § 7206(1). The court thus denies Ms. Christy's motion to set aside the jury's verdict on Counts 8 through 13.

### 4. Counts 18–23: Money Laundering

Finally, Ms. Christy asserts that no reasonable jury could conclude that she is guilty of money laundering in violation of 18 U.S.C. § 1956, as charged in Counts 18 through 23. These counts charge Ms. Christy with making loan payments on six separate occasions using proceeds that she derived from unlawful bank embezzlement. The charges identify the dates when the respective loan payments were made and the amounts of each payment. Ms. Christy contends that the evidence was insufficient for a rational jury to infer that Ms. Christy used money from the bank's vault to make the loan payments.

Section 1956 of Title 18 of the United States Code, in pertinent part, makes it a crime when:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986.

18 U.S.C. § 1956(a)(1)(A)(ii). To secure a conviction under this statute, the government must prove four elements beyond a reasonable doubt: (1) the defendant conducted a financial transaction; (2) the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; (3) the financial transaction involved

the proceeds of unlawful activity; and (4) the defendant conducted the financial transaction with the intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986. *See* 10th Cir. Crim. Pattern Jury Instruction No. 2.73 (2011); *see also United States v. Zanghi*, 189 F.3d 71, 77 (1st Cir. 1999) (reciting the elements the government must prove to obtain a conviction under 18 U.S.C. § 1956(a)(1)(A)(ii)).

The government presented evidence sufficient for a reasonable jury to find each one of the elements necessary to support a money laundering conviction under 18 U.S.C. § 1956(a)(1)(A)(ii). At trial, the government introduced evidence that either Ms. Christy or her husband had made various loan payments in the amounts and on the dates charged in Counts 18 through 23 in the Indictment. Either Ms. Christy or her husband had made each of the payments in cash. A reasonable jury could infer from the circumstantial evidence presented at trial that the cash used to make these loan payments came from funds that Ms. Christy had embezzled from the vault at CNB and that Ms. Christy conducted the financial transactions with the intent to file a false income tax return in violation of 26 U.S.C. § 7206(1). The court thus denies Ms. Christy's motion to set aside the jury's verdict on Counts 18 through 23.

### III. Motion for New Trial

#### A. Legal Standard

Fed. R. Crim. P. 33 provides that the court may grant a motion for a new trial "if the interest of justice so requires." "A motion for new trial under Rule 33 is not regarded with favor and is granted with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007); *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). "The defendant has the burden of proving the necessity of a new trial." *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000) (citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994)

(further citations omitted)).  And, the decision whether to grant a motion for new trial is committed to the sound discretion of the trial court.  *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009); *Herrera*, 481 F.3d at 1270; *Quintanilla*, 193 F.3d at 1146.

### B.  Analysis

Ms. Christy moves the court to vacate her convictions and grant a new trial for several reasons.  After carefully considering her arguments, the court concludes that none require a new trial in the interest of justice.

*First*, Ms. Christy asserts that her counsel had insufficient notice of exhibits that the government produced—for the first time—in an exhibit notebook the first day of trial.  Ms. Christy asked the court to exclude the documents from evidence.  The court denied Ms. Christy's request at trial because the parties disputed whether the government, in fact, had produced the documents.  And, the government had made the exhibits available to the defense the week before trial.  Importantly, Ms. Christy's Motion for New Trial never identifies the exhibits or explains how their admission prejudiced her defense.  The government asserts that these omissions require the court to deny her motion.  The court agrees.

The decision to admit or exclude evidence is committed to the trial court's sound discretion.  *United States v. Watson*, 766 F.3d 1219, 1234 (10th Cir. 2014).  Under this standard, an appellate court "will not disturb [the trial court's] ruling absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment."  *Id.*  But, even if an evidentiary ruling meets this standard to constitute error, the reversal of a defendant's conviction is required only if the error "affect[s] substantial rights" and "result[s] in actual prejudice."  *See United States v. Richter*, 796 F.3d 1173, 1197 (10th Cir. 2015) (explaining that error "which does not rise to [this] magnitude is harmless"

(citations and internal quotation marks omitted)). To decide this question, the court considers whether "an error has a substantial influence on the outcome of a trial or leaves one in grave doubt as to whether it had such effect." *Id.* (*citing United States v. Medina-Copete*, 757 F.3d 1092, 1108 (10th Cir. 2014)).

Here, Ms. Christy never identifies any exhibits that she contends the court should have excluded from evidence. She also has failed to demonstrate that the admission of these exhibits was both clearly erroneous and affected her substantial rights resulting in actual prejudice. Without that showing, the court denies Ms. Christy's Motion for New Trial on this ground.

*Second*, Ms. Christy argues that the court erred by overruling her objection to Steve Snook's testimony that, she contends, was beyond his personal knowledge and thus violated Fed. R. Evid. 602. Ms. Christy's motion never identifies the testimony, specifically, that she contends the court should have excluded. The government thus asserts that the court should reject this argument because it is vague and conclusory.

Despite Ms. Christy's lack of specificity, the court has reviewed Mr. Snook's testimony to determine the basis for this argument. The court infers—based on her arguments—that Ms. Christy is referring to her objections to Mr. Snook's testimony about certain amounts of cash that the bank determined was missing from the Burlington branch's vault after the surprise audit on May 21, 2014. Ms. Christy objected to Mr. Snook's testimony because he was not present at the audit and did not witness Ms. Christy preparing any of the cash out tickets. But, the government's questions asked Mr. Snook about what he had learned as a bank employee about the missing amounts of money. He testified that he was aware of this information because he had knowledge of the bank's records and the audit report. The court overruled Ms. Christy's objections because Mr. Snook was testifying about what he knew from his personal knowledge

as a Director of the bank. The testimony thus did not violate Fed. R. Evid. 602. The court concludes that it properly admitted this testimony at trial. Ms. Christy's second argument provides no reason to grant a new trial.

*Third*, Ms. Christy asserts that the admission of government's Exhibits 30-1, 30-2, 30-3, and 30-4 denied her a fair trial. These exhibits consisted of stage money that provided a visual representation of the physical size of certain amounts of cash at issue in the trial. Ms. Christy never objected to the stage money itself, but she did object to the government's display of placards on the money that, Ms. Christy contends, contained evidence not yet admitted and argumentative summaries. Ms. Christy also argues that the government's display of the placards, only a few feet from the jury, violated Fed. R. Evid. 403, 609, and 701. Doc. 60 at 3.

The court initially sustained Ms. Christy's objection because the government had not yet laid the foundation for the information contained on the placards. But, once a witness—Mr. Snook—provided the foundation for the information on the placards by his testimony, the court allowed the government to display the placards as demonstrative exhibits. But later, Ms. Christy moved for a mistrial when the government continued to display the placards while a different witness was testifying. The court denied the motion for mistrial because it already had concluded that the exhibits were proper demonstrative exhibits supported by Mr. Snook's foundation. But the court ordered the government to remove the placards for the remainder of the evidence presentation because the court found it unfair to display these evidentiary summaries to the jury during the presentation of other evidence.

The government's display of these placards did not deny Ms. Christy a fair trial. The information contained in the placards was supported by Mr. Snook's testimony. The information also was corroborated by other witnesses and evidence presented at trial. For example, Garda

employee Adam Lewis testified that he picked up $90,000 from the Burlington branch on May 20, 2014. He denied picking up the additional $860,000 that Ms. Christy said that she had delivered to Garda. He also denied providing Ms. Christy the two Garda receipts that, the government contends, Ms. Christy fabricated. Lisa Nabus testified that the Federal Reserve Bank reported its receipt of the $90,000 but not the additional $770,000 that Ms. Christy claimed she had sold on May 20, 2014. And, Elaine Gifford testified that Ms. Christy had produced the three Garda receipts the day after the audit to account for the $770,000 missing from the vault. An email authored by Ms. Christy also confirms this fact. Ms. Christy sent an email to Ms. Gifford stating that she hadn't even thought about having the Garda receipts during the audit (although she had said during the audit that Garda never provided her receipts). Ms. Christy attached the three Garda receipts to the email and claimed she found them when she was going through a drawer. The information on the placards thus conformed to the evidence at trial.

Also, the information displayed by these placards was not unduly prejudicial. The placards helped to explain the evidence's relevance in a demonstrative fashion. The government placed them in front of the jury during Mr. Snook's testimony. Although the placards remained in front of the jury for a short time afterward, this continued display was not so prejudicial that it denied Ms. Christy a fair trial. And, the court directed the government to remove them just as soon as Ms. Christy objected. The court thus denies Ms. Christy's Motion for a New Trial on this ground.

*Fourth*, Ms. Christy asserts that the court erred by admitting the government's Exhibits 1 and 1-A. The government introduced these exhibits during Vicky Farres' direct examination. Ms. Christy contends that the exhibits contain inadmissible summaries of her testimony and violate Fed. R. Evid. 403 and 609. Doc. 60 at 3. Exhibits 1 and 1-A are two reports about the

May 21 surprise audit at the Burlington branch.  Ms. Farres testified that she prepared Exhibit 1 because her boss asked her to write up a description of the audit.  Ms. Farres testified that Exhibit 1-A was an audit memorandum to the bank's Board of Directors.  Ms. Farres wrote some of the audit memorandum, and her boss wrote the remaining content.  Ms. Farres reviewed the memorandum and signed it.  Ms. Farres testified that both Exhibits 1 and 1-A were records made and kept in the regular course of the bank's business and described events that Ms. Farres had discovered around the time she prepared the documents.  The court properly admitted these documents under the business records exception to the hearsay rule in Fed. R. Evid. 803(6).

The court also overruled Ms. Christy's objection that the documents were unduly prejudicial.  Ms. Christy asserted that the exhibits contained information that was "cherry-picked" to provide a summary of Ms. Farres' testimony.  The court concluded that this objection addressed the weight of the evidence, not its admissibility, and Ms. Christy would have the opportunity during cross-examination to question the witness about any "cherry-picking."  The court's evidentiary ruling was not an error.  The court properly admitted Exhibits 1 and 1-A.  Ms. Christy's fourth argument provides no reason to grant a new trial.

*Fifth*, Ms. Christy argues that the court erred by allowing Ms. Farres to testify that it was "impossible" for the three Garda receipts to contain the same time stamps.  Ms. Christy contends that this testimony was inadmissible opinion testimony that violated Fed. R. Evid. 701.  During the government's examination, the prosecutor showed Ms. Farres the three Garda receipts that Ms. Christy claimed to have found in a drawer the day after the surprise audit.  All three receipts contain the same time stamp—down to the second.  Each receipt bears a time stamp of 13:35:08.  Ms. Farres testified that it was impossible for all three receipts to contain an identical time stamp.  As an auditor employed by the bank, Ms. Farres was familiar with how Garda printed receipts

after picking up cash from the bank. She also was familiar with how Garda provided those receipts for the bank's records. Her testimony thus was "rationally based on the witness's perception . . . helpful to clearly understanding the witness's testimony or to determining a fact in issue . . . and not based on scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 701. Ms. Farres' testimony was within the scope of Fed. R. Evid. 701. And, cross-examination provided Ms. Christy's counsel every opportunity to make its point—that identical time stamps were not impossible. The court thus denies Ms. Christy's motion on this ground.

*Sixth*, Ms. Christy asserts that the government elicited improper testimony from Elaine Gifford about Ms. Christy's honesty and trustworthiness. Ms. Christy contends that this testimony was improper character testimony, involved prosecutorial misconduct, and violated Fed. R. Evid. 403. The court disagrees. In context, the government was questioning Ms. Gifford about her supervision of Ms. Christy. Ms. Gifford never had discovered that cash was missing from the Burlington vault before the May 21 surprise audit. Ms. Gifford testified that she relied on Ms. Christy to balance the cash in the vault every day. And, she testified that she trusted Ms. Christy to provide accurate balances. After the May 21 surprise audit, Ms. Gifford realized that Ms. Christy had betrayed her trust. Ms. Gifford's testimony was not improper character evidence under Fed. R. Evid. 404 because it was not offered to prove that Ms. Christy committed the crimes charged in the Indictment. Instead, Ms. Gifford's testimony was offered to explain why she had not supervised Ms. Christy more closely in her duties of balancing the vault. Also, the probative value of this testimony outweighs any danger of unfair prejudice to Ms. Christy. This argument furnishes no reason warranting a new trial.

*Seventh*, Ms. Christy argues that she was denied a fair trial when the court allowed the government to question Raylene Thorne, over Ms. Christy's objection, whether she prepared her

testimony by meeting with defense counsel. Ms. Christy argues that this information was irrelevant, inappropriately placed Ms. Thorne's credibility in question, and impugned defense counsel. The government asked these questions on Ms. Thorne's redirect examination. The government argues that these questions were relevant because Ms. Thorne testified during cross-examination that she was responsible, at times, for counting the cash in the vault. The government had interviewed Ms. Thorne during its investigation, and she never had told the government that information before. Also, during Ms. Thorne's cross-examination, she had answered a series of questions from defense counsel in quick succession. In those responses, she incorrectly testified that she would have counted the money in the vault on two occasions when Ms. Christy was out on vacation. But, on redirect, the government corrected Ms. Thorne because she also was out on vacation on those two occasions—vacationing together with Ms. Christy and her husband.

The government asked Ms. Thorne whether she had met with defense counsel to prepare her answers to these questions. The court did not err by admitting this testimony. The testimony was relevant because it showed that Ms. Thorne had provided information to the government during its investigation that conflicted with what she told defense counsel during their interviews of this witness and on cross-examination. The admission of the testimony also did not place Ms. Thorne's credibility in question inappropriately. The court properly instructed the jury about assessing a witness's credibility at the conclusion of the trial. The court explained that the jurors are the sole judges of credibility and the weight to assign to each witness's testimony. The court's evidentiary ruling here was not an error. It also did not deny Ms. Christy a fair trial.

*Eighth*, Ms. Christy asserts that the court erred by overruling her objections to the jury instructions. Ms. Christy's motion never argues, specifically, which instructions were erroneous.

Instead, she identifies all objections that she made on the record during the jury instruction conference. And, she contends that the jury instructions as submitted violated her right to a fair trial. The government responds that Ms. Christy's vague and conclusory arguments about the jury instructions are insufficient to support her motion for a new trial. The court agrees. *See United States v. Jackson*, 876 F. Supp. 1188, 1204 (D. Kan. 1994) (concluding that "[a]bsent any specific argument—and there is none—regarding how this charge affected their defenses, the court has no basis to find or assume unfair prejudice from this jury instruction"). Nevertheless, the court also has reviewed the record it made when overruling Ms. Christy's objections to the jury instructions. The court finds no error in these rulings. It also finds that the jury instructions, as a whole, correctly instructed the jury of the law and were not otherwise improper. *See United States v. Winchell*, 129 F.3d 1093, 1096 (10th Cir. 1997) (explaining that a new trial is not warranted when the jury instructions as a whole "correctly state the law and provide the jury an intelligent, meaningful understanding of the applicable issues and standards" (citation and internal quotation marks omitted)). The court thus denies Ms. Christy's Motion for a New Trial on this ground.

*Ninth*, Ms. Christy accuses the government of prosecutorial misconduct during the presentation of evidence and closing argument. When a motion for new trial asserts a prosecutorial misconduct claim, the court applies a two-part test to determine the merits of the claim. *United States v. Apperson*, 441 F.3d 1162, 1207 (10th Cir. 2006), *cert. denied*, 549 U.S. 1117 (2007). First, the court must decide whether the conduct is improper. *Id.* (citations and internal quotation marks omitted). Second, the court must decide whether the conduct, if improper, warrants reversal. *Id.* (citations and internal quotation marks omitted).

Ms. Christy asserts that the government made inappropriate sidebar comments to the jury and prefaced questions with inappropriate preambles during its presentation of the evidence. Ms. Christy also contends that the government repeatedly led witnesses on direct examination. But Ms. Christy fails to identify the government's alleged inappropriate conduct with any specificity. She also concedes that she did not object to the government's comments in all instances. Without a more specific argument, the court cannot determine whether the prosecutor's conduct was improper and, if so, whether it requires reversal.

Ms. Christy provides more specificity for her arguments about closing argument. She asserts that the government improperly impugned defense counsel by arguing that defense counsel had prepared a government witness. During closing argument, the prosecutor discussed Raylene Thorne's testimony. He pointed out that Ms. Thorne had testified on cross-examination that she had counted the cash in the vault, but she never had provided the government that information when they interviewed Ms. Thorne. The prosecutor stated that it was clear defense counsel had prepared her based on what he characterized as rapid fire questions and responses during cross-examination. And the prosecutor described how Ms. Thorne made mistakes during this testimony on cross-examination. Specifically, she testified that she had counted the cash in the vault on certain days when Ms. Christy was on vacation, but Ms. Thorne could not have done so because she also was on vacation—with Ms. Christy. The prosecutor suggested that the mistakes Ms. Thorne made during the cross-examination are similar to ones made when a person is fabricating.

Defense counsel objected to the prosecutor's statements as improperly impugning counsel. The court overruled the objection because it did not understand the government's comments as accusing defense counsel of fabrication. Instead, the government was suggesting

that Ms. Thorne had fabricated her testimony by making these mistakes. And, the fact that she had met with defense counsel provided context for the questions and answers in which she provided the incorrect information. The prosecutor's statements were not improper. And, even if they were, they do not warrant a new trial.

Ms. Christy also argues that the prosecutor improperly stated in closing argument that Ms. Christy was a more egregious embezzler than other embezzlers because she refused to admit her guilt. Ms. Christy's characterization of the prosecutor's statements strays from the record. In closing, the prosecutor summarized the evidence that—the government argued—showed Ms. Christy's guilt beyond a reasonable doubt. The prosecutor argued that the evidence, in its entirety, should lead the jury to hold Ms. Christy accountable for conduct that she was not willing to accept. The prosecutor also argued that, instead of admitting guilt, Ms. Christy had asserted a ridiculous story to support her defense. And, the prosecutor urged the jury to reject that story because, he contended, the evidence proved beyond a reasonable doubt that Ms. Christy was guilty of the crimes charged. Ms. Christy argues that these statements were improper but offers no case law to support her argument.

The court disagrees that the prosecutor's statements were improper. And, even if they were improper, the comments were not sufficiently severe to produce unfair prejudice and deprive Ms. Christy of a fair trial. The court specifically instructed the jury that they must make their decision based only on the evidence presented in the courtroom, and that the lawyers' statements and arguments are not evidence that factor into that decision. Doc. 46 at 13. In sum, Ms. Christy's prosecutorial misconduct argument provides no reason for granting a new trial.

*Finally*, Ms. Christy asserts that the accumulation of the purported errors discussed above requires a new trial. But, the court does not apply a cumulative error analysis when it finds no

error in the trial. *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) ("Because there was no error in the trial, there is no occasion for us to employ a cumulative-error analysis in order to determine whether defendant's substantial rights were affected."). Here, the court has not found any errors in Ms. Christy's trial. Thus, the court has no error to consider in a cumulative analysis. And, even if Ms. Christy had shown that any of the issues above constitute error, she has not demonstrated that these errors affected her substantial rights. Ms. Christy is not entitled to relief on this ground.

In sum, Ms. Christy has not shown that any of the above reasons require the court to grant a new trial in the interest of justice. The court thus denies Ms. Christy's Motion for New Trial.

## IV.     Conclusion

For the reasons explained above, the court denies Ms. Christy's Motion for Judgment of Acquittal (Doc. 59) and Motion for New Trial (Doc. 60). The government presented evidence sufficient for a rational juror to find Ms. Christy guilty beyond a reasonable doubt of the 19 counts on which the jury convicted her. And, Ms. Christy has failed to show that the ends of justice require a new trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Denise Christy's Motion for Judgment of Acquittal (Doc. 59) and Motion for New Trial (Doc. 60) are denied.

**IT IS SO ORDERED.**

Dated this 1st day of May, 2017, at Topeka, Kansas.

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**